Copy mailed to attorneys for parties by the Court pursuant to Rule 77 (d) Federal Rules of Civil Procedures. 6/24/05



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSEPH ECKSTEIN,

    Petitioner,

v.                                      Case No. 03-C-0885

GARY R. McCAUGHTRY, Warden,
Waupun Correctional Institution,

    Respondent.

## DECISION AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

### I. BACKGROUND

The petitioner, Joseph Eckstein ("Eckstein"), has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his confinement at the Waupun Correctional Institution where the respondent, Gary R. McCaughtry, is warden. Eckstein was convicted of conspiracy to commit first degree intentional homicide and solicitation to commit first degree intentional homicide, in violation of Wis. Stat. §§ 940.01(1), 939.31 and 939.30, following a bench trial in the Brown County Circuit Court on March 29 and 30, 1999. On May 25, 1999, Eckstein was sentenced to forty years in prison on the conspiracy count and ten years in prison on the solicitation count, the sentences to run concurrently with one another.

Eckstein filed a post-conviction motion with the trial court. The motion was denied in a written order dated January 3, 2000. He subsequently appealed both his conviction and the order denying postconviction relief. In his appeal, Eckstein raised the issues of sufficiency of the evidence, double jeopardy and abuse of discretion in sentencing. The Wisconsin Court of Appeals rejected

these challenges in an unreported decision dated July 25, 2000. The Wisconsin Supreme Court denied further review on October 17, 2000.

Eckstein then filed another post-conviction motion on December 10, 2001, pursuant to Wis. Stat. § 974.06. He alleged that he had received ineffective assistance of trial counsel and asserted two grounds for such claim. First, his trial counsel failed to use the mental illnesses of the state's primary witness, Crystal Graham, as grounds for impeachment. Second, his trial counsel did not seek the suppression or exclusion of a tape recording made by Eckstein of Eckstein's conversations with Graham. The Circuit Court held evidentiary hearings on January 22, on June 28 and on July 26, 2002, regarding Eckstein's claims. The January hearing related to the seizure of the tape recording from Eckstein's truck. The June hearing included testimony by Eckstein's trial counsel regarding both issues. The July hearing consisted of arguments by both sides. Eckstein's second post-conviction motion was denied on August 28, 2002. This decision was appealed and affirmed by the Wisconsin Court of Appeals in an unpublished decision dated May 28, 2003. The Wisconsin Supreme Court declined to review the appeal on August 13, 2003.

The events leading up to Eckstein's being charged with the crime for which he was convicted are set forth in the Wisconsin Court of Appeals decision:

> Joseph and Annamaria Eckstein were married in 1988. Annamaria filed for divorce in 1998. In March 1998, Joseph Eckstein met Chrystal Graham through his then-girlfriend, Delores Wuhrman.
>
> During Eckstein's trial to the court, Graham testified that in April 1998, Eckstein told Graham he wished he knew somebody who could "get rid of" his wife. Graham informed Eckstein that her son, Mervel, could find someone to do it. Although specifics were not mentioned during this first conversation, Graham and Eckstein later met to discuss the price of "the job," ultimately agreeing to $10,000. The two met for a third time a few days later. Eckstein reiterated that he wanted his wife "bumped off" the week of June 13 as he would be attending a wedding out of town. Graham informed Eckstein that Mervel suggested planting drugs on Annamaria rather than killing her, as "it would be too risky to kill somebody." Eckstein agreed to the alternative plan. Ultimately, however, Graham was unable to

2

obtain any drugs.

In August 1998, Graham and Eckstein again discussed the plan to "get rid of" Annamaria. Graham, however, had changed her mind about participating in any criminal activity. Consequently, on August 31, Graham reported her discussions with Eckstein to the Green Bay Police Department and agreed to be wired for her next meeting with Eckstein.

On September 1, Eckstein contacted Graham to ask if she would be a witness for his divorce proceedings. The two agreed to meet in person on September 2. The subsequent conversations between Eckstein and Graham were memorialized by two tape recordings. Graham was wired by the police, and Eckstein made his own recording. During the September 2 meeting, Eckstein stated that "he was going to do things his way this time" and further told Graham that he wanted her to get rid of Annamaria by October 15. Eckstein then made various suggestions on how to kill Annamaria. He demonstrated, without speaking, how to slash her throat or stab her in the stomach. Alternatively, he suggested that Graham spray oven cleaner in her mouth. Graham and Eckstein additionally agreed that Eckstein would pay $500 up front and another $500 several days after the job was done. Eckstein would then pay Graham $10,000 after he was cleared of any involvement in the crime. Finally, the two agreed that the job would be done the following weekend, as Eckstein would be out of town.

On September 3, the two met again and, as with the meeting the previous day, two recordings were made. Eckstein gave Graham the initial $500, a business card with Annamaria's photo, keys to Annamaria's car and information on where to find her. Eckstein suggested that it would be easy for Graham to bury Annamaria's body in a cornfield because it was time for farmers to plant their corn. Eckstein additionally told Graham that if she needed a car, she should just change the vehicle identification number on Annamaria's car and retitle it in her name.

At trial the State played the police recording of the September 2 conversation and submitted transcripts of the recording into evidence. The State also played Eckstein's recording of the September 3 conversation, which had been seized from Eckstein's truck sometime after his arrest. The State entered transcripts from the police recording of that same conversation into evidence but did not play the recording in court. The recordings and transcripts corroborated Graham's testimony.

Eckstein testified that it was Graham who initially broached the idea of "getting rid" of Annamaria. He claimed that Graham conferred with her son and suggested three options to Eckstein: (1) plant drugs on Annamaria; (2) take her out of the country; or (3) kill her. Eckstein testified that although he agreed to pay $10,000 to plant drugs on Annamaria, he never agreed to any plan that involved killing his wife. He further testified that it was his understanding that any subsequent references to "hurting" or "getting rid of" Annamaria involved only the plan to plant drugs on her.

(Ex. B. to the Answer (*State v. Eckstein*, 2003 WL 21221954 (Wis. Ct. App. 2003)) ¶¶ 2-8.)

In support of his claim for federal habeas corpus relief, Eckstein advances the same two

3

grounds of ineffective assistance of counsel as he advanced in the state court.

## III. DISCUSSION

"The provisions of the Antiterrorism and Effective Death Penalty Act ('AEDPA') . . . significantly constrain any federal court review of a state court conviction." *Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003). Title 28 U.S.C. § 2254(d) provides that habeas relief may not be granted unless the state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

Contrary to Clearly Established Federal Law

"A rule is 'clearly established' only if it is compelled by existing Supreme Court precedent." *Henry v. Page*, 223 F.3d 477, 480 (7th Cir. 2000). The Supreme Court has explained the "contrary to" standard as follows:

> [A] state-court decision can be "contrary to" this Court's clearly established precedent in two ways. First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000). Furthermore, "a run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Id.* at 406.

4

Eckstein presented his ineffective assistance of counsel claims to the Wisconsin state courts, including the Wisconsin Court of Appeals. In its decision and order of May 28, 2003, that court rejected both of his claims. In doing so, the court identified the applicable law as follows:

> The test for ineffective assistance of counsel has two prongs: (1) a demonstration that counsel's performance was deficient, and (2) a demonstration that the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). To prove deficient performance, a defendant must establish that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The defendant must overcome a strong presumption that his or her counsel acted reasonably within professional norms. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). To satisfy the prejudice prong, the defendant must show that counsel's errors were serious enough to render the resulting conviction unreliable. *Strickland*, 466 U.S. at 687. We need not address both components of the test if the defendant fails to make a sufficient showing on one of them. *Id.* at 697.
>
> This analysis requires a mixed standard of review. We review the circuit court's findings of fact regarding counsel's conduct under a clearly erroneous standard. *State v. Pitsch*, 124 Wis. 2d 628, 633-34, 369 N.W.2d 711 (1985). Whether those facts constitute deficient performance and prejudice are questions of law that we review independently. *State v. Tulley*, 2001 WI App 236, P5, 248 Wis. 2d 505, 635 N.W.2d 807.

(Ex. B. to the Answer ¶¶ 11-12.)

The Wisconsin Court of Appeals correctly identified the law under which it was to assess Eckstein's claim that he had been denied effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court held that "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." The Court also held that, "[t]he defendant must show that there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Id.* at 694. Thus, for a petitioner to establish ineffective assistance meriting a reversal, he must show: (1) deficient performance that (2) prejudiced the defense. *Id.* at 687.

Because the Wisconsin Court of Appeals applied the correct legal rule to Eckstein's claims

5

for relief based on ineffectiveness of counsel, the court's decision was not "contrary to" clearly established federal law as decided by the Supreme Court.

Unreasonable Application of Clearly Established Federal Law

A state court decision results in an "unreasonable application" of clearly established federal law when that court either (1) "identifies the correct governing legal rule from [Supreme Court precedent] but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see also Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004). Moreover, "[u]nreasonable is more than just incorrect or erroneous, and therefore federal courts defer to a state court's application of Supreme Court precedent as long as it is 'minimally consistent with the facts and circumstances of the case.'" *Danks v. Davis*, 355 F.3d 1005, 1008 (7th Cir. 2004) (internal citations omitted); see also *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 557 (7th Cir. 2001) ("If . . . the case falls under the 'unreasonable application' clause, then we defer to a reasonable state court decision.").

The Wisconsin Court of Appeals rejected Eckstein's first claim that his trial counsels' failure to do more to impeach the state's primary witness by not drawing out in more detail her mental health problems amounted to ineffective assistance of counsel. In doing so it stated:

> Graham admitted at the preliminary hearing that she suffers from clinical manic depression. She stated that she has problems remembering things in stressful situations or when she did not take her medication. Graham [sic, Eckstein] argues his trial counsel knew of Graham's condition and should have questioned her about it at trial in order to cast doubt on her credibility. Eckstein's lead trial counsel testified that he did not use the information because Graham's testimony was corroborated by other evidence. The trial court ruled that his attorneys reasonably decided not to impeach Graham and therefore did not perform deficiently.

6

> Eckstein contends Graham's testimony was critical to the State, and a reasonable attorney would have recognized this. He claims Graham's problems were likely to affect her ability to recall the facts. Eckstein also claims that his counsels' deficient conduct prejudiced his right to a fair trial because Graham's credibility was crucial, and impeachment of her testimony would likely have affected the outcome of the case.
>
> We will not second-guess a trial attorney's selection of trial tactics or exercise of professional judgment in the face of alternatives that have been weighed by trial counsel. *State v. Elm*, 201 Wis. 2d 452, 464, 549 N.W.2d 471 (Ct. App. 1996). A strategic trial decision rationally based on the facts and the law will not support a claim of ineffective assistance of counsel. *Id.* at 464-65.
>
> Here, Eckstein's lead trial attorney testified that he had reviewed Graham's testimony from the preliminary hearing and concluded that her testimony was corroborated by the tape recordings of her conversations with Eckstein, which reflected the "critical time where the crime was alleged to have been committed." He therefore determined that Graham's psychological condition was irrelevant given the other evidence. The trial court did not erroneously conclude that this was a strategic trial decision. We therefore conclude Eckstein's attorneys' performance was not deficient in this regard.
>
> Even were we to determine that trial counsels' performance was deficient, Eckstein suffered no prejudice. Graham testified at trial regarding her depression, that she took medication for it, and that she was unable to remember some of the conversations with her son due to stress. The court was therefore aware of Graham's mental condition, and in fact stated that Graham's testimony may not have been credible absent corroboration by the tape recordings and physical evidence. Additional testimony regarding her psychological problems would therefore not likely have led the court to reach a different conclusion.

(Ex. B. to the Answer ¶¶ 13-17.)

To begin, there is a strong presumption that trial counsel's conduct was constitutionally adequate. On this point the *Strickland* court stated:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range

7

> of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See *Michel v. Louisiana*, supra, 350 U.S. at 101, 76 S.Ct. at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689. The Wisconsin Court of Appeals held that the trial court did not erroneously conclude that Eckstein's trial counsel chose, as part of his trial strategy, to not impeach Graham regarding her psychological condition. Trial counsel made such decision because, in his view, Graham's testimony was corroborated by the tape recordings of her conversations with Eckstein. In other words, even assuming Graham's mental condition may have caused her memory to be somewhat suspect, the existence of the tape recordings rendered an all-out attack on her faulty memory to not be the soundest defense approach to take.

Given the strong presumption that such decision "might be considered sound trial strategy," it follows that the Wisconsin Court of Appeals' conclusion that "Eckstein's attorneys' performance was not deficient in this regard" was certainly not unreasonable. In other words, this court cannot conclude that the state courts' ruling on this point constituted an unreasonable application of *Strickland*.

Moreover, the state appellate court also found that, even if Eckstein's trial counsels' performance had been deficient by not more vigorously bringing out Graham's mental health problems, no prejudice occurred. This is because

> Graham testified at trial regarding her depression, that she took medication for it, and that she was unable to remember some of the conversations with her son due to stress. The court was therefore aware of her mental condition, and in fact stated that Graham's testimony may not have been credible absent corroboration by the tape recordings and physical evidence.

8

(Ex. B to the Answer ¶ 17.) Once again, this court cannot say that the state court of appeals' ruling on this point was unreasonable. Such being the case, that the state court determined the failure of Eckstein's counsel to impeach the state's primary witness with her mental health problems to not amount to constitutionally ineffective assistance of counsel was not an "unreasonable application" of federal law.

This then takes the court to the second prong of Eckstein's ineffective assistance of counsel argument - the failure of trial counsel to file a motion to suppress for use as evidence Eckstein's own tape recording of the September 3, 1997 conversation between Eckstein and Graham. The Wisconsin Court of Appeals rejected the claim that trial counsel's failure to seek the exclusion of Eckstein's own tape recording of that conversation amounted to ineffective assistance of counsel under *Strickland*. In doing so it stated:

> Eckstein also argues his counsels' performance was deficient because they failed to seek to exclude his audiotape of the September 3 conversation. The police obtained this tape after finding it in a microcassette recorder during a custodial inspection of Eckstein's truck. Eckstein argues he was led to believe that his September 3 recording was inaudible, and did not know otherwise until the State sought to admit the recording at trial.
>
> Eckstein maintains the recording was the product of an illegal search as well as a violation of discovery because it was not disclosed to the defense prior to trial. The trial court agreed that Eckstein's counsels' performance was deficient by not seeking to exclude the recording. However, the court determined that Eckstein was not prejudiced because there was other evidence to support the conviction, including the police recordings of the conversations.
>
> Eckstein bears the burden of proving both prongs of the *Strickland* test. *Strickland*, 466 U.S. at 687. Because we conclude there was no prejudice, we focus our discussion on that prong only and need not determine whether Eckstein's counsels' performance was deficient. Eckstein argues the State did not have sufficient corroborating evidence absent Eckstein's recording of the September 3 conversation. He also claims the prejudice was not mitigated by the police tape

9

because it was not played in court and was not considered by the fact-finder. Finally, Eckstein points to the trial court's statement that Graham's credibility may have been questionable without the corroboration of Eckstein's recording. Therefore, Eckstein maintains the outcome of the trial would have been different had the recording been excluded.

We conclude that Eckstein was not prejudiced because there is no evidence the conviction was unreliable. We first turn to the September 2 police recording, which was played at trial and the transcripts entered into evidence. In this recording, Eckstein was heard discussing possible ways to kill his wife. For example, Eckstein stated:

> Ah, you know the other thing is what that one lady does with that cleaner, oven cleaner. I mean, if somebody I think got that all over their body and in their mouth and in their lungs or knocked out and, ya know, virtually I mean sprayed their mouth and lungs full or that as well as the whole body, ya know, I think they're gonna be gone.

Eckstein also expressed that it was important he not know what Graham was planning, and that he be out of town when she did it so he would have an alibi, stating, "Cause if, ya know, I know you're gonna shoot her, I might goof up." Eckstein and Graham discussed payment and agreed to meet the next day so Eckstein could make an initial payment to Graham.

Next we turn to the police recording of the September 3 conversation. Although Eckstein claims the recording was not considered by the trial court, a transcript of the tape was entered into evidence as a trial exhibit. When it rendered its decision, the court stated it had "looked at the exhibits, read over the exhibits, some of which I had a chance to consider in the course of the trial and some of which I had not, so I looked through those as well."

In this recording, the following conversation is heard:

> ECKSTEIN: You do this right, ya know, like say in the garage or something. Ya know, murder her in the garage or do it in the garage or something. Load her in the car. Bury her in the cornfield or something.
>
> GRAHAM: Right.
>
> ECKSTEIN: Ya know, between the rows of corn. Nobody

10

will ever know it. You get a car, take the license plate off it, put a LAF on it and, ya know until, ya know, you can get license from um, ya know, a junked or wrecked car or, ya know, steal some license plates or change that little number, ya know, that's up there on the dash.

GRAHAM: The VIN?

ECKSTEIN: Yeah.

GRAHAM: Okay.

ECKSTEIN: Ya know, apply for a new title, ya know, you get a car.

GRAHAM: Okay.

ECKSTEIN: If you wanted a car ...

GRAHAM: Right.

ECKSTEIN: I mean that would be one of the quickest ways there was.

GRAHAM: Right.

ECKSTEIN: Put the person in the car, take the car and the person, get rid of the person, get rid of the license plate and get (undiscernible).

GRAHAM: That's what I plan to do. Thank you.

Eckstein then said he was leaving that afternoon until "the smoke clears" and then he would pay Graham. Graham said she planned on killing Annamaria that weekend, to which Eckstein responded, "Yeah, okay."

Eckstein claims the meaning of his words on the tape are "open to dispute," that he only agreed to plant drugs on his wife, and he was only going along with Graham because he thought she would not actually do anything. However, a fact-finder could determine that the police recordings indicate otherwise. There is nothing ambiguous or open to dispute about Eckstein's statement to "murder her in the garage."

11

Thus, even without Eckstein's recording there is enough evidence in the police recordings to corroborate Graham's testimony and allow a reasonable fact-finder to determine that Eckstein did indeed wish to have his wife killed. Consequently, Eckstein suffered no prejudice.

(Ex. B. to the Answer ¶¶ 18-25.)

As noted above, whether the performance of Eckstein's trial counsel was deficient in this particular regard was not examined by the state court of appeals because that court found that the second prong of the *Strickland* test was not satisfied. More precisely, the court of appeals ruled that Eckstein had failed to satisfy his burden of showing that he was prejudiced by counsels' deficient performance.

To reiterate, in *Strickland* the court held that

[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687. In order to prove the second prong of a *Strickland* violation, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Simply stated, the court of appeals' decision that Eckstein was not prejudiced by trial counsels' failure to seek suppression of Eckstein's tape of the September 3 conversation was not an unreasonable application of *Strickland*. After all, even assuming that Eckstein's counsel had

12

successfully sought suppression of Eckstein's tape, the State nevertheless had a copy of a recording of at least a portion of that conversation, which copy had been made by the police. And a transcript of the conversation captured on that tape was admitted into evidence.

According to the defendant,

> As for the September 3, 1998 recording, the state relies upon the partial transcript from the defective recording and once again suggests that this transcript alone renders trial counsel's deficient performance harmless. Response at 18-20. Once again, the state is wrong.
>
> Only two references in the state's tape, as reflected in the transcript of that tape, suggest that the plan is to kill Annamaria rather than to plant drugs. The first is the reference to loading her into a car and burying her in a cornfield (Exh. E: App. 115 (Trial Exhibit 15:5)). Especially absent the background conversation missing from the state's tape that day, a reasonable fact-finder could have concluded from the virtual impossibility of Graham accomplishing any such thing that the suggestion of her obtaining a car in this manner was not serious.
>
> The only other reference in that transcript to killing Annamaria is Graham's final assertion that she was "planning on killing Anna Marie this weekend" (Exh. E: App. 116 (Trial Exhibit 15:6)). Once again, given the absence of the background for this statement missing from the state's tape, a reasonable fact-finder could have concluded that Eckstein's noncommital response, "Yeah. Okay" reflected not agreement, but disbelief, especially in light of Graham's mental and physical disabilities which would render such action highly unlikely. A reasonable fact-finder likewise could find, given the evidence of Mr. Eckstein's hearing problems, (e.g., Exh. L: 11-12), that he simply did not hear clearly what Graham had said.

(Pet'r's Reply at 13-14.) In other words, Eckstein seems to argue that the fact-finder might have found him not guilty of conspiracy to commit first degree intentional homicide and solicitation to commit first degree intentional homicide if his recording of the September 3 conversation had not been admitted into evidence, and the State was left with only its "partial transcript from the defective police recording" to support its version of the September 3 conversation. Eckstein's argument must be rejected.

13

First, that a fact-finder "could have concluded" or "could find" him not guilty is not the same as demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. And Eckstein has failed to demonstrate that, but for counsels' failure to have Eckstein's copy of the conversation suppressed, Eckstein probably would not have been convicted of conspiracy to commit first degree intentional homicide and solicitation to commit first degree intentional homicide. To the contrary, there is no ambiguity in the following statement by Eckstein to Graham: "You do this right, ya know, like say in the garage or something. Ya know, murder her in the garage or do it in the garage or something. Load her in the car. Bury her in the cornfield or something." That statement is contained in the transcript of the police recording of the September 3 conversation and would therefore have been considered by the trier of fact, regardless of whether Eckstein's tape had been excluded from evidence.

As fact-finder, the trial judge was free to make credibility assessments of the witnesses and weigh their testimony accordingly. The testimony of those witnesses, coupled with the September 2 police recording and transcript of the September 3 police recording, reasonably support the state court's determination that the exclusion of Eckstein's recording would not have changed the outcome of the trial.

In the end, this court finds that the Wisconsin Court of Appeals' determination that Eckstein failed to meet his burden on his claims of ineffective assistance of counsel was not contrary to, nor did it involve an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States. Consequently, Eckstein has failed to demonstrate entitlement to federal habeas relief from his state court conviction. His petition for writ of habeas corpus is

14

therefore denied and this action is dismissed.

**NOW THEREFORE IT IS ORDERED** that the petitioner's petition for writ of habeas corpus be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the clerk of court enter judgment accordingly.

**SO ORDERED** this 1st day of June 2005, at Milwaukee, Wisconsin.

WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge